OPINION
On November 13, 1998, a young man by the name of Kerry Spencer was involved in a fight near Cleveland Avenue on the east side of Columbus. After the fight, Spencer told his friends, Khalief Vaughan, Mustafa Vaughan, DeJuan Groce, and James Jamison, that he "got jumped." That group then went out to settle the score with the person who beat Spencer.
Meanwhile, the defendant, Joseph Monroe, was playing a video game at a friend's house when Khalief and the others came to the door. Although the defendant had not fought Spencer, an argument between the two developed. After exchanging words, tensions appeared to calm when Khalief and the others left and began walking down the street. However, either another gesture or comment was uttered, prompting Khalief to turn his attention back toward the defendant. The defendant then fired at least eleven shots from his 9mm handgun in the direction of Khalief and the others. Khalief was hit twice, once in his left back, and died on the sidewalk from his wounds.
After Khalief's death, the defendant left his weapon at the residence and fled out the back door. With the assistance of several family members, he left the next morning to secrete himself in West Virginia. Some months later, the defendant was stopped at a West Virginia police checkpoint. However, the defendant sped away before the attending officer had an opportunity to ask for his license and registration. The defendant led authorities on a high speed chase through a residential neighborhood before being apprehended. Although the defendant refused to cooperate, his identity was eventually discovered, and he was returned to Ohio to face charges.
On August 2, 1999, the Franklin County Grand Jury indicted the defendant on one count of murder and three counts of felonious assault. All four counts were first and second degree felonies, and were accompanied by an appropriate gun specification.
The defendant was tried before a jury on February 22, 2000. After a day of deliberation, the jury found defendant guilty of all counts. Thereafter, defendant was sentenced to fifteen years to life on count one, plus an additional eight years for each count of felonious assault. The court also imposed an additional three years' incarceration pursuant to the gun specification. With the exception of the specification, the trial court imposed consecutive sentences on each count. Defendant now raises the following two assignments of error:
 [I.] The judgment of maximum consecutive sentences for each count of conviction was in violation of statutory sentencing mandates.
 [II.] The trial court committed reversible error by including "bad time" conditions in appellant's sentence.
In his first assignment of error, defendant contends the trial court failed to make the statutory findings necessary in order to impose a maximum consecutive sentence.
Recently, in State v. Black (Mar. 22, 2001), Franklin App. No. 00AP-895, unreported, we explained:
 * * * We have previously explained that "in sentencing a felony offender, a trial court must impose a sentence that is reasonably calculated to achieve the two overriding purposes of felony sentencing, i.e., protecting the public from future crime by the offender and others and punishing the offender." State v. Hough (Nov. 23, 1999), Franklin App. No. 99AP-238, unreported. When reaching a decision, the trial court must consider the need to prevent future crime, rehabilitation, and restitution. In addition, the court must impose a sentence that is commensurate with, and not demeaning to, the seriousness of the offender's conduct, and its impact upon the victim or victims. Id. A trial court has broad discretion when sentencing, and this court will not override the court's sentence unless the trial court has abused its discretion. Id., citing State v. Epley (Aug. 25, 1998), Franklin App. No. 97APA11-1467, unreported.
A maximum sentence for a given offense may be imposed by a trial court upon offenders who commit the worst forms of the offense, upon offenders who pose the greatest likelihood of committing future crimes, upon certain major drug offenders, and upon certain repeat violent offenders. R.C. 2929.14(C). Similarly, in order to properly impose consecutive sentences, a trial court must find "that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public * * *." R.C. 2929.14(E)(4). According to that section, the court must also determine whether any one of the following are applicable.
 (1) Whether the offenses were committed while the defendant was awaiting trial or sentencing, or was under post-release control for a prior offense.
 (2) Whether the harm caused by the offenses was so great or unusual that a single prison term would not reflect the seriousness of the defendant's conduct.
 (3) Whether the defendant's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from the defendant's potential future criminal acts.
Finally, the court must set forth its reasons for selecting maximum and/or consecutive sentences. R.C. 2929.19(B)(2)(c). Although we find it preferable for the trial court to incorporate these findings and its reasoning in a sentencing entry, that information need not be specified in the entry so long as it is discernible from the record as a whole. Black, supra; State v. Belfon (July 13, 2000), Franklin App. No. 99AP-663, unreported; and State v. Hess (May 13, 1999), Franklin App. No. 98AP-983, unreported.
The linchpin of the defendant's first assignment of error is his claim that the trial court either failed, or erred, in setting forth the reason for imposing his sentence. Defendant argues: (1) that the trial court incorrectly found that he had committed the worst form of the offense; (2) that the seriousness of his conduct is mitigated because the decedent allegedly initiated the dispute, and was armed himself; and (3) that he is not likely to commit future offenses. However, defendant's arguments to the contrary, we are unable to find the trial court abused its discretion.
The trial court conducted a sentencing hearing on April 20, 2000. At that time, the judge explained on the record:
 With respect to why I have chosen to run these cases consecutive, I would indicate that the defendant has indicated by his behavior [that] he poses a danger to the public. He has committed multiple offenses in this instance, and a single prison term with respect to these offenses would, in fact, not adequately reflect the seriousness of [the] defendant's conduct. He shot at an entire crowd of people, three people in particular, and one person was shot at and killed; and consecutive sentences are not disproportionate to the seriousness of [the] defendant's conduct.
 The defendant also has a criminal record, both as a juvenile and as an adult, and it would appear from that it would be necessary to protect the public from future crimes by the defendant. It's also the worst form of the offense. I don't know that the victim was particularly vulnerable, but the victim's life, in fact, has been taken. [Sentencing Tr. at 7-8.]
In addition to the findings set forth directly above, the record reveals the defendant has an extensive criminal record, including adjudications for theft, receiving stolen property, drug abuse, truancy, attempted receiving stolen property, grand theft, and carrying a concealed weapon. Further, the evidence and testimony at trial showed that the defendant used a "Tech-9," a combat type of weapon to kill Khalief, and that he did so while Khalief attempted to flee, or, at a minimum, after he had turned away.[1] The record also clearly shows that the defendant fired multiple rounds toward Khalief and the rest of his group in the middle of a crowded residential neighborhood. Indeed, investigators found bullet holes not only in Khalief's body, but riddled in cars and houses surrounding the crime scene as well. The defendant also deliberately secreted himself in another state hoping to avoid apprehension for Khalief's murder, and was able to do so for some period of time with the help of an organized network of support. Finally, when cornered in West Virginia, defendant led authorities on a high speed chase through a residential neighborhood, further demonstrating his complete disregard for the safety of others.
In light of the foregoing, we conclude that the record supports the defendant's sentence, and that the trial court adhered to the statutory requirements when it imposed that sentence. Finding no error or abuse of discretion by the trial court, defendant's first assignment of error is overruled.
In his second assignment of error, defendant argues that the trial court erred when it imposed "bad time" conditions upon his incarceration. Although decided and released on June 14, 2000, after the date on which the defendant was sentenced, in State ex rel. Bray v. Russell (2000), 89 Ohio St.3d 132, the Ohio Supreme Court determined that the administrative imposition of bad time to a prison term for an alleged criminal violation occurring during the course of an individual's term, violates the constitutional doctrine of separation of powers. Accordingly, the Supreme Court of Ohio found R.C. 2967.11
unconstitutional. Id. at 134. As such, we sustain defendant's second assignment of error.
For the foregoing reasons, defendant's first assignment of error is overruled and his second assignment of error is sustained. The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this cause is remanded to that court so that the court may strike the bad time conditions from the defendant's sentence.
 _____________________ PETREE, J.
BROWN and TYACK, JJ., concur.
[1] According to the Franklin County Coroner, both rounds from the defendant's weapon entered Khalief`s body from behind and traveled forward, proving that he was shot in the back as he ran, or at least faced away from the defendant.